# Third District Court of Appeal

## State of Florida

Opinion filed January 25, 2017.
Not final until disposition of timely filed motion for rehearing.

————————————

No. 3D15-1420
Lower Tribunal No. 12-26693

————————————

**City of Sunny Isles Beach, etc.,**
Appellant,

vs.

**Calvary Corp., etc., et al.,**
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, Jerald Bagley, Judge.

Holland & Knight LLP, and Christopher N. Bellows, Rodolfo Sorondo, Jr., and Rebecca M. Plasencia; Hans Ottinot, City Attorney, and Fernando Amuchastegui, Deputy City Attorney, for appellant.

Akerman LLP and Gerald B. Cope, Jr.; Law Offices of Robin Bresky and Joanne Rose Telischi and Michele K. Feinzig (Boca Raton); J. Wiley Hicks, for appellee, Karen P. Tucker, Trustee.

Before WELLS and SALTER, JJ., and SHEPHERD, Senior Judge.

SHEPHERD, Senior Judge.

This is an appeal by the City of Sunny Isles Beach from the denial of its motion for new trial, arising from a jury verdict in an eminent domain case setting forth what the City owed the landowner as fair and just compensation for the taking of a portion of a finger canal to build a bridge for use as an emergency evacuation route to the mainland from the barrier island on which the city is situated. The City claims evidentiary error in the proceeding. We find none and write only to address the City's contention that the trial court abused its discretion by admitting into evidence conceptual site plans to establish the highest and best use of the property as a private docking facility. A brief summary of the facts of this case is necessary to explain our decision.

**FACTS**

The property in this case consists of 2.81 acres of predominantly submerged land, created by dredge many years ago. The landowner or title holder of the fee is Karen P. Tucker, Trustee (the "Owner"). The property today is one of many natural or man-made canals which jut off larger water bodies in the state, generating additional waterfront living and recreational opportunities for the comfort and pleasure of its citizens. Like many of these finger bodies, especially in South Florida, this finger canal dead-ends at one of its lengths. Before the taking, the property included a bulkhead on its north side and a small upland strip that connected it to North Bay Road, a major thoroughfare running along the

2

eastern boundary of the barrier island on which the City is located, providing access to other communities to the north and south, including the City of Miami Beach. The canal also had unobstructed access to the Intracoastal Waterway.[1]

In 2012, the City took .18 acres (approximately 7,900 square feet) of the property to build a bridge to connect North Bay Road to the mainland. The bridge, apparently well into the planning stages, intersects the canal property and will impede marine access to the Intracoastal Waterway for most of the remaining canal property. For all the years since the current owner acquired title to the property and before, there has been no effort by an owner to develop the canal property. Its use has been limited to casual use by private boaters who have motored into the canal, jet skiers, and the like.

Although the Owner made no effort to develop the property before it received the notice of taking from the City, it contended at trial, based upon conceptual site plans prepared by one of its testifying experts, that the highest and best use for valuation of the injury to the property caused by the taking is that of a private docking facility for adjoining condominiums or homes. As evidence of the economic viability of this use, the Owner points out that since it purchased the property, the Winston Towers condominium complex, with 1,200 residential units,

---

[1] An aerial photograph of the property showing the canal, its relationship to the Intracoastal Waterway and development that has grown up around the property is attached to this opinion. The canal runs in an east-west direction, with the east end opening to the Intracoastal Waterway and the other a dead end.

has been constructed along the property's north side. The private docking facility the Owner posits as the highest and best use for the property is proposed to be comprised of forty-six boat docks.

The City counters that the proposed highest and best use has sprung forth fully formed from the brow of one of its testifying experts solely for the purpose of trial. The City accurately states the Owner of the property never took any affirmative step to develop the property in any fashion, much less spent a single cent to improve the underwater property or obtain an agreement with an adjoining landowner to build parking, access and utilities to the hypothetical facility. Despite testimony to the contrary, offered by the Owner's experts, the City proffered, somewhat disconcertingly, one might think, to those who regard the use of one's private property as a constitutional given, that the proposed facility is not economically viable because it would require going through various permitting agencies, including the U.S. Army Corps of Engineers, South Florida Water Management District, Miami-Dade County (including its Manatee Protection Plan), and numerous other commenting agencies that advise these permitting agencies, such as the Florida Fish and Wildlife Conservation Commission, U.S. Fish and Wildlife Service and National Oceanographic Administration. Opining that the property "essentially had no economic use potential" – sounding in substance like a categorical taking – the City appraiser opined the fair-market

4

value for the entire parcel was $1,000.[2]   Rejecting the City's proffer, the jury awarded the Owner the exact amount it sought, $855,000, as fair and just compensation for the taking, including the reduction in value to the remaining parcel resulting from lack of access to the Intracoastal Waterway.  We find no error in the jury verdict.

## ANALYSIS

The United States and Florida Constitutions safeguard private property rights.  Daniels v. State Rd. Dep't., 170 So. 2d 846, 849 (Fla. 1964).  The Florida Constitution guarantees that "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid to each owner."  Art. X, § 6(a), Fla. Const.

Where less than the entire property is sought to be appropriated, any damages to the remainder caused by the taking must be included in the compensation awarded.  Partyka v. Fla. Dep't of Transp., 606 So. 2d 495, 496 (Fla. 4th DCA 1992).  "These 'damages to the remainder' are called 'severance damages' and are measured by the reduction in value of the remaining property." Kendry v. Div. of Admin., State Dep't of Transp., 366 So. 2d 391, 393 (Fla. 1978).

---

[2] The City's most recent valuation for property tax purposes was $1,300. However, tax-assessed value is not conclusive evidence of market value, and is not typically admissible in an eminent domain proceeding against a private landowner. The Florida Bar, Florida Eminent Domain Practice and Procedure § 10.70 (9th ed. 2014).

Thus, "full compensation [is required] for both the property taken and for damages to the remaining property." Fla. Power & Light Co. v. Jennings, 518 So. 2d 895, 898 (Fla. 1987).

The Owner's expert appraiser employed the "development approach," sometimes also referred to as "discounted cash flow" method, to determine the market value of the property.[3] Although recognized in authoritative eminent domain treatises, the first Florida court that dealt in any detail with this approach for the valuation of an undeveloped tract of land was the First District Court of Appeal in Boynton v. Canal Authority, 265 So. 2d 722 (Fla. 1st DCA 1972). See 4 Julius L. Sackman, Nichols' The Law of Eminent Domain § 12B.14 (rev. 3rd ed. 2001); The Florida Bar, Florida Eminent Domain Practice and Procedure, § 9.62

---

[3] Both the Owner's appraiser and City's appraiser explored using the sales approach for valuing the property, but found insufficient data to support use of this methodology. The Owner's appraiser found only one comparable sale of vacant canal property with no permitting in place, no uplands, no agreements with adjacent landowners, and subject to the Manatee Protection Plan in nearby Aventura, which had sold in 2006 for $300,000. The City's appraiser found a vacant canal parcel equal in size to the one here where the owner had obtained County approval to building a private docking facility with approximately 120 slips and obtained an easement from nearby condominium owners for uplands access. Although listed for sale, it had not sold by the time of the trial. While not useful, strictly speaking, for determining market value of the instant property, this evidence tended to confirm the testimony of the Owner's environmental expert that the issuance of the permits necessary to install a private docking facility on the property was "reasonably probable." See Bd. of Comm'rs of State Institutions v. Tallahassee Bank & Trust Co., 100 So. 2d 67, 69 (Fla. 1st DCA 1958) (holding this to be the standard for valuation of vacant land where prohibitions or restrictions on use are modifiable or removable within a reasonable time).

6

(9th ed. 2014). <u>Boynton</u> teaches that under the development approach: (1) the property is valued as of the date of the taking; (2) the question for the appraiser is what a willing buyer would pay for the property in its then-existing condition on that date, for development into its highest and best use; and (3) the highest and best use may be a prospective use. <u>Id.</u> at 724.

The <u>Boynton</u> decision is very similar to the case before us. In <u>Boynton</u>, the highest and best use of the property <u>before</u> the taking was "water oriented recreational development," but the taking eliminated the water access. The court approved the use of the development approach to the facts of this case, explaining:

> [T]he testimony sought to be adduced was based on the actual value of the property at the time of the taking <u>if sold for recreational development, its highest and best use. Nothing had to be done to the property in order to enhance its value.</u> In arriving at his opinion as to the present value of the property, the appellants' appraiser took into consideration the profit ratio of the developer, the time in which the developer could sell the lots, and the number of lots the developer could sell and at what price. These considerations were based on the appraiser's experience and were specifically considered in order to show present value of the property in terms of what a developer would be willing to pay at the present for the land. Therefore, <u>the value opinion was based on the property being sold at that time for development</u>, not what the property would be worth if developed and then sold, although the yield to the future developer was taken into consideration by the appraiser in determining present value.
>
> . . . .
>
> <u>The development approach is an acceptable method of valuation</u> and although no Florida case has dealt with it in detail, it is recognized in Nichols on Eminent Domain, Second Edition, and Florida Eminent Domain Practice and Procedure, Second Edition. The appraiser for

7

appellants testified that the lack of comparable sales in the area required the use of the development approach for an accurate valuation. Accordingly, it is our view that <u>the appraiser should have been allowed to testify as to what the property could be sold for, with the riparian rights attached, in keeping with his opinion that the property is presently suitable for sale to a recreational developer.</u>

<u>Id.</u> at 723-24 (emphasis added). Just as in <u>Boynton</u>, the expert appraisal testimony offered by the Owner under the "development approach" method for determination of fair and just value in the case before us "was based on the actual value of the property at the time of the taking if sold for [development as a private docking facility], its highest and best use." <u>Id.</u> The conceptual plans were plainly admissible to illustrate and support the expert appraiser's testimony.

The City argues that under <u>Yoder v. Sarasota Cnty.</u>, 81 So. 2d 219 (Fla. 1955), <u>overruled in part</u>, <u>State Rd. Dep't v. Chicane</u>, 158 So. 2d 753 (Fla. 1963), the Owner's appraisal evidence should have been excluded as speculative. The City is mistaken. As the <u>Boynton</u> court explained, the development approach is <u>not</u> speculative, and does <u>not</u> violate <u>Yoder</u>. <u>Boynton</u>, 265 So. 2d at 723-24.

<u>Yoder</u> is different. In <u>Yoder</u>, the property owner, who was disappointed with her fair and just compensation award in an eminent domain case, argued that the trial court erred by excluding evidence of the greater value the property would have if filled to a level sufficient to adapt it to various uses. The Supreme Court

held the trial court correctly excluded this proffered evidence of the value, explaining:

> We have consistently ruled that the amount of compensation to be awarded to a property owner when his property is sought to be taken in an eminent domain proceeding is the value of the land taken at the time of the lawful appropriation. It is appropriate to show the uses to which the property was or might reasonably be applied, and the damages, if any, to adjacent lands. Nevertheless, the value must be established in the light of these elements as of the time of the lawful appropriation. It is not proper to speculate on what could be done to the land or what might be done to it to make it more valuable and then solicit evidence on what it might be worth with such speculative improvements at some unannounced future date. . . .

Yoder, 81 So. 2d at 220-21 (citations omitted).  In the case before us, the Owner did not violate Yoder because the Owner did not seek compensation based upon what could or might be done to make the land more valuable and then solicit evidence on what it might be worth.  Rather, borrowing from language used in Boynton itself, "the testimony [] adduced [in the case before us] was based upon the actual value of the property at the time of the taking if sold for development [as a private docking facility], its highest and best use."[4]

We note in passing that the valuation methodology used by the Owner in this case, relying on a highest and best prospective use, even though the Owner has no

---

[4] The Boynton court also held inapplicable Coral Glade Co. v. Bd. of Public Instruction of Dade Cnty., 122 So. 2d 587 (Fla. 3d DCA 1960), where the owner wanted compensation based on additional cost for the owner to complete a development.  The Boynton court explained the distinction, "[T]he opinion as to the value was based on present value for recreational development, not on the value of the property when developed."  265 So. 2d at 724.

plans to sell the property or use it for that use, is precisely the same strategy long employed by county appraisers in appraising property for tax assessment purposes. See, e.g., Vero Beach Shores, Inc. v. Nolte, 467 So. 2d 1041 (Fla. 1985); Miami Atlantic Dev. v. Blake, 334 So. 2d 29 (Fla. 3d DCA 1975). We affirm the award made to the Owner of the canal property in this case.

Affirmed.



11